UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE  DIVISION

| | | |
|---|---|---|
| WILLIAM R. VANES,         ) | | |
|       Plaintiff,         ) | | |
| ) | | |
|   vs.         ) | | 2:07-cv-00063 RLY WGH |
| ) | | |
| INDIANA COMMISSION ON PUBLIC      ) | | |
| RECORDS,         ) | | |
|       Defendant.         ) | | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and
PLAINTIFF'S COUNTER-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff suffers from cerebral palsy.  From September 19, 1983, until March 10, 2006, he was employed by the Indiana Commission on Public Records ("ICPR") as a microfilmer.  In his Complaint, Plaintiff seeks redress under the Rehabilitation Act of 1973 for alleged disability discrimination, including ICPR's failure to accommodate his known disability.  In order to set forth a prima facie case under the Rehabilitation Act, the Plaintiff must show that he was involved in a program which received federal financial assistance. *See Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999). In the ICPR's Motion for Summary Judgment, it contends that the Plaintiff cannot make such a showing, because the ICPR did not receive federal funds at the time of the alleged discrimination.  In Plaintiff's Counter-Motion for Partial Summary Judgment, he contends the ICPR did in fact receive federal funds at all relevant times.  The court, having read and reviewed the parties' submissions, the evidence of record, and the

1

applicable law, and having heard and considered the parties' oral argument, now **DENIES** the ICPR's Motion for Summary Judgment, and **DENIES** the Plaintiff's Counter-Motion for Summary Judgment.

**I.   Factual Background**

   **A.   Employment History**

1. The ICPR is a state agency which assists state and local governments in the efficient and effective management of public records, by providing services throughout the life cycle of records, including creation, use, storage, and disposition. (Plaintiff's Reply Brief at 1; *see also* Deposition of Steve Daniels ("Daniels Dep.") at 16). It can thus be described as a central service agency.

2. On September 19, 1983, Plaintiff began working for ICPR as a Microfilmer IV in the Imaging/Micrographics Department. (Plaintiff's Complaint ¶ 2).

3. On February 10, 2006, Plaintiff was suspended for allegedly failing to meet a quota of 150 images per hour. (*Id*. ¶¶ 2, 6).

4. On March 10, 2006, the ICPR terminated his employment. (*Id*. ¶ 2).

   **B.   Grant Money**

5. ICPR currently has two accounts containing funds which are designated as accounts for grant monies. Such accounts are identified with an account number beginning with 6000. Accounts with a 6000 number do not necessarily contain federal grant monies, but can contain any type of grant and/or endowment funds. (Declaration of James R. Corridan ("Corridan Dec.") ¶ 4; Declaration of Michael

Degner ("Degner Dec.") ¶¶ 4, 7).

6. Federal grant money can be used only for the specific purpose of the grant. Therefore, once the project for which the grant was received is completed, any remaining monies cannot be used on different projects or for different purposes. (Corridan Dec. ¶ 8).

7. In 1983, ICPR received a Records Inventory Grant which was funded by the National Historic Publication and Records Commission. The initial funding was in the amount of $24,800.00. (Corridan Dec. ¶ 4).

8. The Records Inventory Grant account currently contains an amount of $26.30. This amount has remained unchanged since 1997. (*Id.*; Degner Dec. ¶¶ 4, 7).

9. Also in the 1980s, ICPR received a Forms Review Grant. The issuer of the grant is unknown and the initial funding amount is unknown. (Corridan Dec. ¶ 5).

10. The Forms Review Grant account currently contains an amount of $7.48. This amount has remained unchanged since 1997. (*Id.* ¶ 5; Degner Dec. ¶¶ 4, 7).

11. On February 28, 2006, ICPR applied for a grant to the National Historic Publication and Records Commission. (Deposition of James R. Corridan ("Corridan Dep.") at 47-55; NHPRC Grant Application and Supporting Documentation, Plaintiff's Ex. 4[1] at 157). ICPR did not agree to accept the terms and conditions of the grant until the grant application had been tentatively

---

[1] The court will cite to specific documents by first designating the party's exhibit no. (i.e. "Plaintiff's Ex. 4"), followed by the name of the exhibit and page number, if applicable. All later references to the exhibit will be to the party's exhibit no. only.

approved pending ICPR's agreement, which occurred in May of 2006. (Corridan Dep. at 56; Plaintiff's Ex. 4 at 164).

**C.  Workshop**

12. On May 25, 2005, Deborah Stanley ("Ms. Stanley"), County and Local Records Coordinator for the ICPR, attended a workshop which was sponsored in part by the Library of Congress. (Library of Congress Training Information and Federal Expense Reimbursement Statements, Plaintiff's Ex. 5 at 147).

13. Pursuant to the Library of Congress' Travel and Expense Policy, the Library of Congress agreed to pay for her travel expenses, including hotel, airfare, and meals. (*Id.* at 149).

14. On August 10, 2005, Ms. Stanley filled out a travel voucher for her travel expenses, and on September 6, 2005, filled out a document entitled "Authorization for Out of State Travel" in the amount of $489.40. (*Id.* at 372, 380).

15. There is no evidence in the record that the Library of Congress reimbursed the ICPR for these costs.

**D.  The Statewide Cost Allocation Plan**

16. ICPR performs services for other Indiana state agencies which implement federal programs, such as Indiana's Family and Social Services Administration ("FSSA"). In order for the State to recoup some of the central service costs it incurs in implementing these programs, the federal government requires states to prepare a Statewide Cost Allocation Plan ("SWCAP"). (*See, e.g.*, Plaintiff's Ex. 8, State of

4

      Indiana Statewide Cost Allocation Plan, Fiscal Year 2006).

17. Indiana's SWCAP has been in existence for about eight to ten years, and thus, was in existence at the time of the alleged discrimination. (Daniels Dep at 25-26).

18. The State explained during oral argument that pursuant to the SWCAP, a central service agency, such as the ICPR, sets forth its proposed budget for the costs of the central services it provides to other state agencies implementing federal programs to the State Budget Agency. Its proposed budget is based upon the costs it incurred two years previously. (*See also* Daniels Dep. at 25). After receiving the budgeted costs from all of Indiana's central service agencies, the State Budget Agency prepares the SWCAP and submits it to the Federal Department of Health and Human Services ("HHS"). (Chapter 12 of the Accounting and Uniform Compliance Guidelines Manual for State and Quasi Agencies, Plaintiff's Ex. 7, at 12:4). HHS then determines which costs are subject to reimbursement, and remits those monies to the State's General Fund.

19. The ICPR, as a central service agency, is paid from the State's General Fund. (*Id.* at 27).

20. Steve Daniels ("Mr. Daniels"), Controller of the State Budget Agency, testified that for accounting purposes, "at least proportionally" the ICPR receives federal dollars indirectly through the SWCAP recovery system. (Daniels Dep. at 28).

    **E.**     **Memorandums of Understanding With Other State Agencies**

21. ICPR and the Indiana Department of Transportation ("INDOT") entered into a

        Memorandum of Understanding ("MOU") effective November 19, 2004 through November 19, 2005.  (Defendant's Ex. 2, Memorandum of Understanding Between the Indiana Department of Transportation and Indiana Commission on Public Records).

22. ICPR and the FSSA also entered into a MOU effective September 1, 2003, to August 31, 2006.  (Defendant's Ex. 3, Memorandum of Understanding Between the Indiana Family and Social Services Administration Division of Disability, Aging and Rehabilitative Services and Indiana Commission on Public Records).

23. Pursuant to both MOUs, an employee from INDOT and an employee from FSSA were temporarily placed under the supervision of ICPR in order to use ICPR's equipment to microfilm FSSA's and INDOT's records.  (*See* Defendant's Exs. 2, 3).

24. The MOUs specifically provided that the FSSA and INDOT would pay the salaries of these employees.  (*Id*.).

      **F.**    **Services to Other Agencies**

25. The Indiana Auditor's Office receives federal financial assistance in the form of funds, services, training, or property that it uses to perform ICPR's banking functions.  (Deposition of James Corridan ("Corridan Dep.") at 17-21).

26. The Indiana Department of Administration performs payroll functions for ICPR and receives federal financial assistance.  (*Id*. at 29-32, 37).

## II.     Summary Judgment Standard

Disposition of a case on summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The record and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264 (7th Cir. 1996).

The moving party bears the burden of demonstrating the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden may be met by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. If the moving party meets its burden, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleading," but must present specific facts to show that there is a genuine issue of material fact. FED. R. CIV. P. 56(e); *see also Nat'l Soffit*, 98 F.3d at 265 (citing *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428 (7th Cir. 1991)).

As this case is before the court on cross motions for summary judgment, the court evaluates each movant's motion under the requirements of Rule 56 stated above. WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 at 23-24 (2d ed. 1990) ("The court must rule on each party's motion on an individual basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56

standard.").

### III.   Discussion

#### A.    The Rehabilitation Act

The Rehabilitation Act protects a "'qualified individual with a disability' from discrimination solely because of his disability in any program receiving federal financial assistance." *Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004) (quoting 29 U.S.C. § 794(a)).  To set forth a prima facie case under the Rehabilitation Act, Plaintiff must show: (1) he suffers from a disability as defined by the Act; (2) he was otherwise qualified for his position; (3) he was involved in a program which received federal financial assistance; and (4) he was discriminated against solely due to his disability.  *Id*.

The United States Supreme Court explained that Congress intentionally limited the scope of the Rehabilitation Act to entities which actually receive federal funds because it wanted to impose "coverage as a form of contractual cost of the recipient's agreement to accept the federal funds."  *United States Dep't of Transp. v. Paralyzed Veterans of America*, 477 U.S. 587, 605 (1986).  "By limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to "receive" federal funds."  *Id*. at 606.

The starting point of the court's analysis is to identify the recipient of the federal financial assistance.  Although Section 504 does not define "Federal financial assistance," the governing regulation at 28 C.F.R. § 41.3(e) provides:

> *Federal financial assistance* means any grant, loan, contract (other than a

>procurement or a contract of insurance or guaranty), or any other arrangement by which the agency provides or otherwise makes available assistance in the form of:
>
>(1) Funds;
>(2) Services of Federal personnel; or . . .

28 C.F.R. § 41.3(e).

>In addition:
>
>*Recipient* means any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, division, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

28 C.F.R. § 41.3(d).

Thus, entities, including state governmental entities, that receive federal financial assistance, whether directly or through an intermediary, are recipients subject to liability under Section 504. *See Paralyzed Veterans*, 477 U.S. at 607. There is one proviso: the entity must be a recipient of federal financial assistance during the time of the alleged discriminatory conduct; otherwise, the entity cannot be liable under Section 504. *See Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 896 (C.A.D.C. 1998) (noting that the relevant time period in which to analyze a Rehabilitation Act claim is when the alleged discriminatory act occurred); *Stephanidis v. Yale Univ.*, 652 F.Supp. 110, 113 (D. Conn. 1986) (Rehabilitation Act extends only to time period during which federal financial assistance was being extended); *Bachman v. Am. Society of Clinical Pathologists*, 577 F.Supp. 1257, 1260-61 (D. N.J. 1983) ("The present tense language of

the statute and implementing regulations reflects the fact that federal funding is conditioned on the recipient's simultaneous compliance with the anti-discrimination provisions of section 504). In the instant case, Plaintiff claims he was subjected to discrimination due to his alleged disability when James Corridan ("Mr. Corridan") became the Director of ICPR in approximately August of 2005. As he was terminated on March 10, 2006, the relevant time period for purposes of this case is August 2005 to March 10, 2006.

### B.  Direct Financial Assistance

Plaintiff contends that the ICPR received direct federal financial assistance during the relevant time period through training, grants, and grant applications. The court will begin with Plaintiff's claim that the ICPR received direct federal financial assistance in the form of Library of Congress training and funds.

#### 1.  Library of Congress Training and Funds

On May 25, 2005, Ms. Stanley,[2] an employee with ICPR, attended a workshop entitled "Library of Congress Consultation Workshop." (Plaintiff's Ex. 5 at 147). Pursuant to the Library of Congress' Travel and Expense Policy, it agreed to compensate Ms. Stanley for her travel costs, including her airfare, hotel, and meals. (*Id*. at 149). From the evidence of record, it appears that Ms. Stanley filled out the appropriate travel

---

[2] An email communication dated April 7, 2005, indicates that two other ICPR employees were to attend the workshop. (*Id*. at 378). However, there is no other evidence in the record showing that these employees attended the workshop or applied for reimbursement for the travel expenses associated with their attendance at the workshop.

voucher (State Form 90) on August 10, 2005, and filled out a document entitled "Authorization for Out of State Travel" (State Form 823), on September 6, 2005, in the amount of $489.40.  (*Id.* at 372, 380).  These documents, however, are State-generated forms.  There is no documentation from the ICPR or the State of Indiana requesting reimbursement from the Library of Congress, nor evidence indicating that the Library of Congress ever paid the ICPR for Ms. Stanley's travel expenses.  Without such evidence, the court must find, as a matter of law, that the ICPR did not receive federal funds as a result of Ms. Stanley's attendance at the workshop sponsored by the Library of Congress.

### 2.    Grants

Plaintiff contends that because the ICPR received a Records Inventory Grant in 1983 and a Forms Review Grant around that same time period, and because the balance of the grant money remains in ICPR accounts, it should be considered a recipient of federal financial assistance during the relevant time period (August 2005 to March 10, 2006).

J. Michael Degner, Controller of the ICPR, testified that these accounts with respect to the Records Inventory Grant and the Forms Review Grant have remained the same since 1997, and that no other 6000 accounts at ICPR were active during this time period.  (Degner Aff. ¶ 7).  Based upon this testimony, the court concludes that the programs to which the monies were tied are no longer active programs with the ICPR.  There being no other evidence in the record tying these federal grant monies to active programs with the ICPR between August 2005 to March 10, 2006, the court must

conclude, as a matter of law, that the ICPR was not the recipient of federal financial assistance with respect to these accounts during the relevant time period.

### 3. Grant Application

Plaintiff next claims that the ICPR's February 28, 2006, grant application to the National Historic Publication and Records Commission is sufficient to show that the ICPR was a recipient of federal funds during the relevant time period. The grant application and its supporting documents are in evidence as Plaintiff's Exhibit 4. These documents include the February 28, 2006, grant application signed by Mr. Corridan on behalf of the ICPR. (Plaintiff's Ex. 4 at 157-63).

The relevant inquiry for purposes of application of the Rehabilitation Act is when ICPR agreed to accept the terms and conditions of the grant, including its anti-discrimination assurances. *Crandall*, 146 F.3d at 896. In this case, the evidence reflects that the ICPR did not agree to accept the terms and conditions of the grant until May 31, 2006, over two months after Plaintiff was terminated from his employment with the ICPR. (Plaintiff's Ex. 4 at 164; *see also* Plaintiff's Ex. 4 at 186). Accordingly, the court must find, as a matter of law, that the ICPR was not a recipient of federal financial assistance as a result of its grant application with the National Historic Publication and Records Commission during the relevant time period.

### C. Indirect Federal Financial Assistance

The majority of Rehabilitation Act cases involve the direct receipt of direct federal financial assistance, such a federal grants. Although the federal regulations contemplate

that an entity may receive federal financial assistance indirectly, there are few cases that address this issue. The three most often cited in cases of this nature are: *Paralyzed Veterans*, *supra*., 477 U.S. 597 (1986); *Grove City College v. Bell*,[3] 465 U.S. 555 (1984) and *National Collegiate Athletic Association v. R.M. Smith*, 525 U.S. 459 (1999) (hereinafter "*NCAA*").

The issue presented in *Paralyzed Veterans* was whether commercial airlines were indirect recipients of federal financial assistance under Section 504 of the Rehabilitation Act by virtue of the fact that airport operators received federal grants for "airport development or airport planning." 477 U.S. at 604-05. In finding that commercial airlines were not indirect recipients, but rather beneficiaries of the projects completed with grant money, the court held that "[t]he statute covers those who receive the aid, but does not extend as far as those who benefit from it." *Id*. at 607. To find that the statute applied to those who benefitted economically from federal aid would yield almost limitless coverage. *Id*. at 608.

The issue before the Court in *Grove City College* was whether Grove City College was an indirect recipient of federal financial assistance by virtue of the fact that it accepted students who received Basic Educational Opportunity Grants ("BEOGs"), 20 U.S.C. § 1070a, under the Department of Education's Alternative Disbursement System.

---

[3] Although *Grove City College* and *NCAA* are cases brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), they are often cited in the context of cases brought under the Rehabilitation Act, since the antidiscrimination measures are defined in nearly identical terms. *See NCAA*, 525 U.S. at 466 n. 3.

13

In finding that Grove City College was an indirect recipient of federal financial assistance, the Court found that "the BEOG was structured to ensure that it effectively supplement[ed] the College's own financial aid program," and that, "[i]n fact, one of the stated purposes of the student aid provisions was to 'provid[e] assistance to institutions of higher education.'" 465 U.S. at 565. Thus, "a college receives federal financial assistance when it enrolls students who receive federal funds earmarked for educational expenses." *NCAA*, 525 U.S. at 466.

The issue presented in *NCAA* was whether the NCAA was an indirect recipient of federal financial assistance subject to Title IX by virtue of the fact that its dues-paying member institutions were direct recipients of federal financial assistance. The Court, citing *Paralyzed Veterans* and *Grove City College*, found the NCAA was not an indirect recipient.

> Unlike the earmarked student aid in *Grove City*, there is no allegation that NCAA members paid their dues with federal funds earmarked for that purpose. At most, the Association's receipt of dues demonstrates that it indirectly benefits from the federal financial assistance afforded its members. This showing, without more, is insufficient to trigger Title IX coverage.

*Id*. at 468.

With these principles in mind, the court now turns to the parties' arguments below.

### 1. Services to Other Agencies

ICPR performs records management services for other agencies, including the FSSA and the INDOT. Plaintiff argues that because these agencies are the recipients of

federal funds, and because these agencies pay ICPR for its services, the ICPR is a recipient of federal financial assistance.

The record reflects that the ICPR entered into two MOUs: one with FSSA and one with INDOT, during the relevant time period. Pursuant to these MOUs, an employee from the FSSA and an employee from the INDOT were temporarily placed under the supervision of the ICPR in order to use ICPR's equipment to microfilm FSSA's and INDOT's records. (*See* Defendant's Exs. 2, 3). The MOUs specifically provided that the FSSA and the INDOT would pay the salaries of these employees out of accounts specifically designated for that purpose. (*Id*.). With respect to the MOU between the ICPR and the INDOT, the document states, "Payment for this service shall come from funds provided by the Division [of Land Acquisition]." (Defendant's Ex. 2). With respect to the MOU between the ICPR and the FSSA, the document states, "Payment for these services shall come from funds provided by the Division from Account 1000 108600, DDARS administrative." (Defendant's Ex. 3). The evidence of record fails to show the type of funds in these accounts. The mere fact that they were in designated accounts is not evidence that these accounts did not contain federal funds, and the ICPR's statement in its Reply Brief that they did not contain federal funds is not evidence. Moreover, the court is unable to ascertain from the MOUs whether the funds in these accounts were earmarked for records management services to be performed by the ICPR such as the funds in *Grove City College*. Given this record, the court finds a genuine issue of material fact exists as to whether the microfilming services which the ICPR

provided to the FSSA and the INDOT were paid for with federal funds, and, in addition, whether the ICPR was the intended recipient of those funds.

Plaintiff also argues that the ICPR received federal funds indirectly from other state agencies like the Indiana Department of Administration, which performs payroll functions for the ICPR, and the Indiana Auditor's Office, which performs banking functions for the ICPR. To the extent these state agencies received some form of federal financial assistance to perform services for ICPR, (Corridan Dep. at 29-38), ICPR merely benefits from those funds. *See Paralyzed Veterans*, 477 U.S. at 606-10. The court therefore finds that ICPR does not receive federal funds indirectly through these sources.

### 2. The SWCAP

Plaintiff argues that the ICPR was the recipient of indirect federal financial assistance by virtue of the ICPR's participation in Indiana's SWCAP program. As noted in the Facts Section, the ICPR is paid from the State's General Fund, but the funds which the ICPR claims as indirect costs – those costs it incurs in providing archiving and records management services to other state agencies which implement federal programs – are reimbursed by HHS through the SWCAP program into the State's General Fund.

In addressing Plaintiff's argument, Plaintiff directs the court to the State of Indiana's "Accounting and Uniform Compliance Guidelines Manual for State and Quasi Agencies" (the "Manual"), the document which explains the rules which govern the State's accounting practices. Chapter 12 of the Manual, entitled "Federal Financial Assistance Programs," under the heading "State-Wide Cost Allocation Plan (SWCAP),"

16

reads as follows:

> The State Budget Agency does an annual "State-Wide Cost Allocation Plan" which accumulates the state-wide costs and allocates them to all state agencies. See also <u>Indirect Costs</u>[4] section. The federal share of the state-wide indirect costs is to be paid to the State Budget Agency to reimburse the State's General Fund for the costs incurred by the State in relation to the federal grants and programs. The steps for reimbursement are as follows:
>
> (1) If the agency receives no federal funds, neither directly or as "pass through," it is exempt from cost recovery.

---

[4] Chapter 12 of the Manual also explains the meaning of "indirect costs":

Indirect costs are those costs that benefit more than one grant but the effort to allocate to each specific grant is disproportionate to the results achieved. Indirect costs may originate within an agency (i.e., accounting personnel's time which is attributable to several different grants), or outside an agency (i.e., cost of processing documents and warrants by the Auditor of State).

The Auditor of State's Office is an example of a "state-wide" indirect cost. The State Budget Agency does an annual "State-Wide Allocation Plan" which accumulates the state-wide costs and allocates them to all state agencies. See the <u>State-Wide Cost Allocation Plan (SWCAP)</u> section. An agency's accounting personnel's time is an example of a departmental indirect cost. These costs must be determined and allocated to the agency.

The general procedure for charging indirect costs to a federal grant is to negotiate an "indirect cost rate" with the federal cognizant agency. This rate should include both the state-wide and departmental indirect costs. The rate and the basis to apply the rate are to be approved by the federal awarding agency. The state agency then applies the rate, charging that cost to the federal grants. The federal share is reimbursed through the normal drawdown procedures.

(Plaintiff's Ex. 7 at 12:3-4).

> (2) If the agency receives federal funds, either directly from the federal government or as pass-through from other state agencies, use the Proposed Costs from Schedule A of that fiscal year's SWCAP as indirect cost recovery owed the state. . .

(Plaintiff's Ex. 7 at 12:4).

Based upon Chapter 12 of the Manual and the applicable federal regulations, 28 C.F.R. §§ 41.3(d) and (e), Plaintiff argues that ICPR is an indirect recipient of federal financial assistance. His argument begins by noting that through the SWCAP, the HHS "makes available" federal funds by reimbursing Indiana's General Fund for the indirect costs that ICPR incurs in providing archiving and records management services to other state agencies which receive federal grant money directly. He argues that HHS extends federal financial assistance to the ICPR "through another recipient," namely, the State of Indiana, by reimbursing the State for the indirect costs of its central service agencies, including the ICPR. Plaintiff supports his argument with the testimony of Mr. Daniels from the State Budget Agency, who admitted that the ICPR receives federal dollars indirectly through the SWCAP program. (Daniels Dep. at 28 ("But for accounting purposes, at least proportionately, some of the monies that ICPR receives would indirectly come through the SWCAP recovery system from federal dollars.")).

ICPR contends that the SWCAP program of reimbursement is insufficient to trigger the application of the Rehabilitation Act for three reasons. First, the ICPR argues that the monies recouped through the SWCAP program are analogous to the dues payments that the NCAA received from its member institutions in *NCAA*. The court finds

this argument is misplaced. Dues are monies paid in order to be a member of an organization. Here, the monies paid to the ICPR are for the services it provides to those agencies. Thus, the payments cannot be classified as "dues."

Second, the ICPR argues that there is no evidence that the costs recovered through the SWCAP program were specifically earmarked for that purpose, contrary to those in *Grove City College*. Plaintiff has presented both documentary and testimonial evidence that the ICPR "charges" other state agencies for the services it provides those agencies which receive direct financial assistance. The ICPR, on the other hand, presents testimonial evidence that it is paid strictly out of the Indiana General Fund, and receives no direct federal funding. With the limited evidence presented, the court finds that a reasonable juror could draw inferences in favor of either party. As such, there is a genuine issue of material fact as to whether the ICPR is a recipient of federal financial assistance within the meaning of Section 504 and its implementing regulations.

Third, the ICPR argues that there is no evidence in the record that the ICPR is the intended recipient of federal financial assistance and, as support, cites the court to OMB Circular A-87. (Defendant's Reply Brief at 17). The ICPR, however, did not submit it as evidence nor explain the significance of that document. As such, the court cannot conclude, as a matter of law, that the ICPR was not the intended recipient of federal funds. For these reasons, Defendant's Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part, and Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

**IV.    Conclusion**

For the reasons set forth above, the Defendant's Motion for Summary Judgment (Docket # 10) is **GRANTED** in part, and **DENIED** in part.  Defendant's Motion is **GRANTED** with respect to Plaintiff's claims that the ICPR was the recipient of direct financial assistance during the alleged discriminatory period; and is **DENIED** with respect to Plaintiff's claims that the ICPR was the indirect recipient of federal financial assistance during the alleged discriminatory period.  Plaintiff's Counter-Motion for Partial Summary Judgment (Docket # 24) is **DENIED**.

**SO ORDERED** this  20th   day of March 2008.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Robert Peter Kondras Jr.
HUNT HASSLER & LORENZ LLP
kondras@huntlawfirm.net

Kathryn Lynn Morgan
INDIANA STATE ATTORNEY GENERAL
Kathryn.Morgan@atg.in.gov

Juliana B. Pierce
INDIANA STATE ATTORNEY GENERAL
Julie.Pierce@atg.in.gov